UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

THOMAS NORMAND                    CIVIL ACTION NO. 24-1558

VERSUS                            JUDGE EDWARDS

NOLAN BASS ET AL                  MAG. JUDGE PEREZ-MONTES

## MEMORANDUM RULING

Before the Court is a Motion for Preliminary Injunction[1] filed by the plaintiff, Thomas Normand ("Normand" or "Plaintiff"), seeking to enjoin Nolan Bass ("Bass" and Robert Rushing ("Rushing") (collectively, "Defendants") from preventing Normand from receiving publications in the mail to the Tensas Parish Detention Center ("TPDC"). Specifically, Normand alleges that Defendants' policies on inmate access to reading materials is violative of Normand's rights under the First Amendment.[2] Defendants oppose the motion, citing safety concerns from allowing free flowing publications to enter TPDC.[3] Normand then replied.[4] For the following reasons, Normand's request for Preliminary Injunction is **GRANTED.**

## I.    PROCEDURAL BACKGROUND

On January 17, 2025, a hearing was held on Normand's request for a preliminary injunction.[5] Normand presented testimony from himself and two of his fellow inmates at TPDC, Dedric Mitchell and Evan Hall.[6] Defendants called Bass to

---

[1] R. Doc. 12.
[2] R. Doc. 12-1 at 4.
[3] R. Doc. 21.
[4] R. Doc. 22.
[5] R. Doc. 23.
[6] R. Doc. 24.

testify as the warden of TPDC.[7] After the hearing, the parties submitted post-hearing briefs.[8]

## II.    FACTUAL BACKGROUND

Plaintiff Thomas Normand has been incarcerated at TPDC since December of 2020.[9] TPDC is a local parish jail that houses inmates in the custody of the Department of Safety and Corrections ("DPSC") under an agreement with the Sheriff of Tensas Parish, Defendant Rushing, due to overcrowding at state correctional facilities.[10] Normand resides in a dormitory that houses 88 men.[11]

On December 13, 2024, Normand filed this motion, alleging that Defendants' policies and practices regarding access to publications function as a de facto book ban for men incarcerated at TPDC, thereby violating his First Amendment right to access information.[12]

Normand alleges that he has repeatedly sought access to reading materials through written and verbal requests.[13] At the preliminary injunction hearing, Normand testified that despite four years of making such requests, he has not received a single publication. He argues that because Defendants prohibit inmates from receiving books in the mail and fail to provide meaningful access to reading

---

[7] R. Doc. 24.
[8] R. Docs. 26, 27, and 30.
[9] R. Doc. 1 at 4.
[10] R. Doc. 12-1 at 4.
[11] *Id.*
[12] R. Doc. 12-1 at 6.
[13] R. Doc. 12-1 at 5; R. Doc. 26 at 2.

materials within TPDC, the policies together amount to a blanket ban on reading materials, violating his First Amendment rights.[14]

In their initial written response, Defendants acknowledge that TPDC bans inmates from receiving books in the mail, citing security concerns regarding drug smuggling.[15] They assert that contraband, including liquid drugs, can be introduced through mailed publications and that TPDC staff lack the resources to manually inspect every page of every book.[16] Instead, Defendants claim that TPDC solicits and accepts book donations from local libraries, which are placed in a small reading library where inmates may borrow books.[17] However, at the hearing on this preliminary injunction, Mr. Normand, Mr. Mitchell, and Mr. Hall testified that inmates have no direct access to this library.[18]

Contrary to Defendants' initial response,[19] Bass testified that inmates may request approval to receive publications through the mail. He further testified that he had never received a request for any publication from Normand. Importantly, Bass confirmed that if Normand were to make such a request, it could potentially be approved. In support of Bass' testimony, Defendants submitted into evidence the TPDC books and publications policy. This policy provides: "[o]ffenders may subscribe to publications which pose no security concerns to the facility (i.e. drug, racism, hate,

---

[14] R. Doc. 12-1 at 5.
[15] R. Doc. 21 at 4-5.
[16] R. Doc. 21 at 5.
[17] R. Doc. 21 at 5.
[18] Their testimony indicates that access to this library requires the presence or assistance of "inmate counsel." None of the witnesses have obtained books from this library.
[19] Defendants initial response was supported by a Declaration from the Warden Nolen Bass. R. Doc. 21-1.

sex). Final authority on these matters lies with the Warden. Any publication which is denied to an offender will be explained to the offender and documented."[20] Mr. Normand, Mr. Mitchell, and Mr. Hall testified they that were unaware of this policy.

Normand's motion sought an order directing TPDC to "allow Plaintiff to receive publications and other reading materials through the mail during the pendency of this litigation."[21] However, during the hearing, Normand agreed to narrow his request. In his post-hearing brief, he further refined his position, asking the Court to order Defendants to implement a policy mirroring DPSC's existing procedure on publications.[22] Specifically, he now requests that the Court require TPDC to allow "publications and books be received directly from the publisher or other approved vendor, unless otherwise provided by the rules of the facility."[23] Defendants contend that their current policy, set forth above, is constitutional.[24]

## III.    LEGAL STANDARD

A plaintiff seeking a preliminary injunction must prove each of the following four factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest."[25]

---

[20] R. Doc. 25 at 2, Exhibit 1.
[21] R. Doc. 12-1 at 13.
[22] R. Doc. 26 at 6.
[23] R. Doc. 26 at 6.
[24] R. Doc. 27 at 5.
[25] *Newsouth Communications Corp. v. Universal Telephone Co.*, 2002 WL 31246558 at *10 (E.D. La. 10/4/02) (citing *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir.1989)).

Then these factors are considered as a whole to determine whether "they collectively favor granting the injunction."[26] Any injunctive relief is considered "an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by clear showing, carries the burden of persuasion."[27]

## IV.    LAW & ANALYSIS

The Court finds that Plaintiff has demonstrated a substantial likelihood of success on the merits in showing that Defendants' practices violate his First Amendment rights. Accordingly, a preliminary injunction is warranted to prevent the continued deprivation of Plaintiff's constitutional rights. However, even Plaintiff's narrowed proposed order remains overbroad in light of the institutional security concerns and logistical limitations raised by Defendants. Thus, while the Court grants the preliminary injunction, it does so in a manner to appropriately balance Plaintiff's rights with Defendants' legitimate penological interests.

### A. Normand has demonstrated a substantial likelihood of success on the merits.

The Constitution protects the right to receive information and ideas.[28] In *Turner v. Safley*, 482 U.S. 78, 95 (1987), the Supreme Court held that "[i]t is settled that a prison inmate 'retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'"[29]  Prison regulations that restrict constitutional rights must be

---

[26] *Newsouth,* 2002 WL 31246558 at *11 (citations omitted).
[27] *Newsouth,* 2002 WL 31246558 at *11.
[28] *Stanley v. Georgia*, 394 U.S. 557, 564  (1969).
[29] *Turner v. Safley*, 482 U.S. 78, 95 (1987) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

"reasonably related to legitimate penological interests."[30] To evaluate that "reasonableness" requirement, courts utilize four factors: (1) whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison; and (4) whether there are obvious, easy alternatives that may evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns.[31] Of those four factors, "rationality is the controlling factor,"[32] and the remaining factors are best understood as indicators of rationality.[33]

As to the first factor, Defendants have articulated a legitimate penological interest in banning inmates from receiving books through the mail—namely, preventing the introduction of contraband into the facility. The Court acknowledges that this concern is both neutral and rationally related to institutional security. Thus, the Court agrees that a ban preventing unfettered access to publications through the mail is reasonably related to a legitimate penological objective. However, Defendants' practice does not stop at banning publications through the mail—it extends to a de facto ban on access to reading materials altogether. The evidence presented demonstrates that while TPDC purportedly maintains a reading library, there is no

---

[30] *Id.* at 89.
[31] *Thornburgh v. Abbott*, 490 U.S. 401, 414–18.
[32] *Mayfield v. Tex. Dep't of Criminal Justice*, 529 F.3d 599, 607 (5th Cir. 2008).
[33] See *Scott v. Miss. Dep't of Corr.*, 961 F.2d 77, 80–81 (5th Cir. 1992).

system in place for inmates to access it. Plaintiff Normand and other inmates testified that they have requested reading materials for years without success. The lack of a functioning alternative means of obtaining books is critical to the Court's analysis.

Under *Turner*, the second factor—whether there are alternative means of exercising the right—weighs heavily in favor of Plaintiff. If Defendants merely restricted access to publications through the mail but provided an alternative means for inmates to access reading materials, the policy might withstand constitutional scrutiny. Defendants argue that even if inmates cannot receive books through the mail, they still have access to reading material through TPDC's library.[34] Plaintiff, however, contends that no meaningful alternative exists because TPDC's "library" is nothing more than a nominal designation—there is no established process for inmates to check out books, and multiple prisoners, including Normand, testified that their repeated requests for reading materials have gone unanswered for years.[35] The evidence supports Plaintiff's claim that no alternative avenue exists. At the hearing, Defendant Bass failed to rebut testimony establishing that inmates have been left with no practical means of obtaining reading material. A nominal "library" that does not function in any real capacity is not a legitimate alternative, and its mere existence does not prevent a determination that TPDC's policies and practice amount to an effective prohibition to access information without an alternative means of exercising the right.

---

[34] R. Doc. 21 at 5.
[35] R. Doc. 12-1 at 9; R. Doc. 26 at 3-5.

The third *Turner* factor—the impact of accommodating the right on guards and other inmates—does not weigh heavily in Defendants' favor. While the Defendants' assertion that allowing any party to mail any publication to a prisoner would have an outsized impact on prison staff and security is legitimate, Defendants have not shown that allowing books from approved vendors would pose an insurmountable burden or risk. Further, at the hearing, Defendants stated that TPDC had recently received a number of books from a local library. So, to the extent Defendants argue that allowing books would require additional staffing or pose a security risk, those concerns are mitigated by the fact that TPDC already claims to possess a reading library. If a reading library exists, there is no legitimate reason why Defendants cannot implement a basic system for inmates to borrow books. At the hearing, all the inmates who testified stated that they had previously been housed at other detention facilities. All of them testified that publications were allowed in those facilities which had varying restrictions such as limitations on the number of publications. The fact that other detention facilities were able to accommodate access to publications belies the Defendants' assertion that access to publications would create an unmanageable impact on TPDC.

Finally, the fourth *Turner* factor—whether there are obvious, easy alternatives—weighs in favor of the Plaintiff. As discussed above, there exist alternatives to accessing information such as allowing access to the library or TPDC accepting publications through the mail from approved vendors which would abate security concerns.

Considering the *Turner* factors, the Court finds that while Defendants do have a legitimate interest in restricting direct mail access to publications in order to prevent contraband, their policy—when combined with the complete lack of alternative access to reading materials—warrants the granting of this preliminary injunction. The evidence presented at the hearing demonstrates that inmates have no viable means of obtaining books or other reading materials, despite Defendants' claims of a reading library. Thus, Normand has shown a substantial likelihood of success on the merits.

**B. Normand faces a substantial threat of irreparable injury.**

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."[36] Indeed, the Supreme Court has said that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[37] Having found that the Plaintiff has made a showing that he is substantially likely to succeed on his constitutional claim, injunctive action is warranted.

**C. The balance of harms weighs in favor of Normand.**

To justify injunctive relief, Normand must also show that the threatened harm to him outweighs any damage to Defendants if the injunction is granted. While Defendants argue that unrestricted access to mailed publications poses a security risk, the Court is not ordering such unrestricted access. Rather, the Court will tailor its order to minimize the burden on Defendants.

---

[36] *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (citations omitted).
[37] See *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

**D. The public interest favors granting injunctive relief.**

"Injunctions protecting First Amendment freedoms are always in the public interest."[38] Here, granting relief serves the public interest by ensuring that Defendants' policies comply with constitutional requirements while still allowing them to maintain prison security. A narrowly tailored injunction would not unduly interfere with prison administration but would ensure that incarcerated individuals retain at least properly published procedures for accessing reading materials.

**V.     CONCLUSION**

For the reasons set forth above, Plaintiff's Motion for Preliminary Injunction (R. Doc. 12) is **GRANTED**. An Order consistent with this Ruling will be issued accordingly.

**THUS DONE AND SIGNED** this 19th day of February, 2025.

_____
**JERRY EDWARDS, JR.**
**UNITED STATES DISTRICT JUDGE**

---

[38] *Opulent Life Church*, 697 F.3d at 298 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).